The Clerk Welcome. Thank you. Would you help me with the pronunciation of your surname? Hart. Hart. Very well. Please proceed. Thank you. May it please the Court. This is a case where the patentee sought to claim a particular compound. But due to poor drafting, combined with the desire to expand the reach of the claims to tens of thousands of compounds. Let's go right to the question. If we interpret the claim as you would like to interpret it, we have just rendered superfluous claim 5, claim 2, 9, and 10, which would be totally meaningless under your reading of the claim, right? Didn't the district judge do quite correct in giving meaning to all the claims in reaching the interpretation that he did? Those are all dependent claims and... All the more so a reason why they should be subsumed within the independent. Well, but they should be drafted to reflect proper dependency. And if claim 1 does not encompass topiramine, claim 5, which is dependent on claim 1, is invalid. Yeah, but of course that's logically correct, but the issue is what does claim 1 cover? You're assuming the outcome and saying, well, therefore the dependent claims were improperly drawn. The other possibility is the dependent claims were perfectly properly drawn because the independent claim does cover topiramate. And there's four of them. They had to make the same mistake four times. No, they made the mistake once. Well on topiramate, they made it very clearly, overtly, under your reading in claim 5, but 2, 9, and 10 would also read on things that can't exist because under your reading that R2, R3, and or 4 and 5 would not contain either a hydrogen or a lower alkyl. But that's the sad consequence of using the word and in claim 1. Or the intended consequence of using and in a conjunctive sense, which dictionaries allow. Well, dictionaries allow it in very rare and limited circumstances. And this seems to be one of them. Well, only if you assume going into it that because the drafter intended to cover topiramate that the word and should be given the 14th meaning. But they seem, they don't just seem to intend that, they explicitly intend that because they put claim 5, a dependent claim, right into the patent and say look, if you read the whole patent, it's obvious we mean topiramate to be in the independent because we're claiming it here as a dependent. And the same with 2, 9, and 11 to follow. That doesn't carry the date. The intent doesn't carry the date. Well, that's the issue in the case. It's easy for you to say it doesn't carry the date, but that's exactly what we have to decide. Does it or does it not carry the date? We have additional. Does it help us for you to just keep repeating your conclusion here? We have the independently and together language, which also suggests that you were looking at the independent side of the claim in one way and the together side of the claim in a different sense. Can you respond to that part too? I can. The word independently in claim 1 is not used as any kind of a signal that and is being used in the disjunctive side. Why not? Singly and together seem to be opposites. So why isn't that a hint, maybe not dispositive, but a hint that we're talking about two alternatives. One involves single or independent. The other involves grouped. The word independently is there to make clear that when R2, 3, 4, and 5 are hydrogen or lower alkyl, that it's not required that they all be hydrogen or all be lower alkyl. R2 can be a hydrogen. R3 can be a lower alkyl. That's what's meant by the word independently. Well, that's a nuanced way of looking at that word. But the problem I'm having is that certainly this claim gives you lots of things to point to as reasons why the claim doesn't cover what the parties contend it covers. There are lots of reasons to point to that claim and find fault with that claim. But that's not the test. The test is, is it incapable of being interpreted in a way that gives it some meaning and in a way that's reasonable in light of the written description and the prosecution history? And isn't that exactly the analysis that the district court went through and isn't that correct? I don't think that is the correct analysis. I don't think that just because you determine from the specification that the patentee intended this result that you have to bend English language in a way that accomplishes that result. I'm not suggesting bending the language or rewriting the claims at all. That is clearly contrary to our precedent. But I'm suggesting that you look to the claims and the question is whether it's incapable of some interpretation that is consistent with the wording used, that is consistent with the entire record, that gives meaning to all of the words used. And if you look to the context of the claim and you look to the written description, I think these words independently and together as a group do provide some signal. I think that's a litigation-induced position. He's not induced by litigation. He's the judge trying to neutrally decide this case. I understand, but take a look at the claim that's originally drafted. That's on 8561. This shows you how this monstrosity came into being. The way the claim was originally drafted, it said R2, 3, 4, and 5 are independently hydrogen or lower alkyl and this was the wording that was crossed out. When X is CH2, R4 and R5 may be alkaline groups joined to form a benzene ring. And when X is oxygen, R2 and 3 and 4 and 5 can be formula 2. Now it's originally written, the signals were there. The signal was when. When she was good, she was very, very good, and when she was bad, she was horrible. They took those signals out during the claim drafting. But they left some signals behind. But the claim 5 is still explicitly to pyramid. I'm still wondering what do I do with that claim. I'm not saying that they couldn't have claimed to a pyramid very easily. Yeah, but the question is what would the ordinary artisan make of this claim, reading this claim, reading this set of claims. And it seems to me that ordinary artisan would start out with a strong presumption, probably required by our case law, that the proper construction would be that which would cover the preferred embodiment, one of the preferred embodiments. And the claim 5 is obviously a preferred embodiment. And the specification sets out in gory detail everything one would need to know about the pyramid. So then to turn around and say, well, let's ignore all that, because the word and was used when maybe the meaning was or. It seemed like a perverse reading, as if it's a word game, not a common sense game for chemists reading a patent. Well, claim drafting is a precise art. Look at the NPEP. The NPEP tells you how to go about doing this. The question is why is it sensible to give a construction to claim 1 that excludes a preferred embodiment? Because of the word and. That's a perverse reading. That's against common sense. But it's perfectly consistent with the common meaning of the word and. Sometimes it means and, sometimes it means or. So the issue is, in this context, which is the more sensible, logical reading? And does not sometimes mean or. It means or in rare cases where there is a clear linguistic signal telling the reader that. But in common everyday usage, the word and does not mean or. And that was a trial court's mistake. If you look at the NPEP and how to do a Markov script. Why do we care about common usage? We're talking about what a chemist would make out of reading his claim. Well, as Dr. Deroshefsky, the plaintiff's chemist testified, the word and has no meaning to a chemist. Different than anyone on the street. That's not the question. The question is what the claim means. Does the claim set out two conditions, both of which have to be present? Or does the claim set out two conditions, one or the other of which has to be present? Well, but look at the mandatory versus the permissive language. The claim reads R2, 3, 4, and 5 are hydrogen or lower alkyl. That's a mandatory condition. And Topira made, of course, R2, 3, 4, and 5 are not hydrogen or lower alkyl. That condition has to be met simply because of the mandatory nature of the word are. On the other side, you have the word may. I have the same problem with your interpretation of are and may as I do with your interpretation of the word and. It reads it perversely to make a patent meaningless. Not meaningless. The patent covers many, many compounds. It just doesn't cover the compound that was important to them. Mr. Hart, I'd like to ask you a question or two before your time is up on obvious. What what what evidence in this record suggests that the formation of an FTP inhibitor might be a treatment for diabetes? That was contained in the affidavit testimony of Dr. Anderson, who's a noted carbohydrate chemist. He talks about the work that had been done in the prior hour to identify FTP. Yeah, but Mr. Hart, KSR has told us we look at a problem solving approach on occasion. The problem you're trying to solve apparently is diabetes. How do you get to an epilepsy drug from that? I mean, you're not going to be focused on an epilepsy drug. And why would you stop at the intermediate in the first place? Well, claim one is just the compound. So we're not worried about what we're going to use there. Distinguish this case from Yamanuchi, which is very similar in the sense of, yes, there are some little indicators here and there that you might do this or you might do that. But if you, well, there's nothing to indicate you would start with a diabetes drug to get an epilepsy drug. No, there's not. But the question here is if you were faced by the same problem that the inventor faced, would you, through the use of known steps and processes, come up with topiramate? The question of whether topiramate would be recognized as an effective anticonvulsant drug is the question that you have with respect to claims 6, 7, and 8. And there we have testimony from a noted medicinal chemist. In hindsight, yeah, now that I see it, yeah, maybe you could do that. But is there anybody who says from the outset, yeah, you know, I was looking for the way to get an anticonvulsant. And I said, let's try this. Let's start with this diabetes drug. And after making a few modifications, let's stop at this intermediate and test it, topiramate. Let's not go on to the conclusion of the diabetes process. Now, under that kind of an analysis, a serendipitous invention could never be obvious because the inventor was looking at a different problem than the problem that was ultimately solved. Well, to the extent that you end up with unexpected results, you'd at least have a very powerful secondary consideration, wouldn't you, which would militate strongly against a finding of obviousness. Just as our district court did. Not on summary judgment. What we have here is a situation where the court simply weighed the evidence, decided that Dr. Daniszewski's opinions would be adopted over Dr. Anderson's. But we never had a trial. This should have gone to the jury. They should have heard both experts. They should have been subject to prosecution. Why? Because there were experts on each side? There's no case law that says if I, as the non-movement, can come up with some expert to say anything, I automatically get a trial. That's not what the law is. No, of course it's not. But in this case, Dr. Anderson made a detailed analysis. He talked about how well-known FDPAs was in gluconeogenesis. Well, that was his conclusion. And in his expert report, I read his report, and in paragraph five he makes some statements. But he doesn't point to anything to suggest that there was any recognition of that at all. Well, but that's the KSR mistake. The district court, in this work, rigorously applied the teaching suggestion motivation. Well, I don't think anything in KSR suggested that you shouldn't look rigorously at the factors that go into obviousness. Now, maybe rigidity in terms of applying a test is something else. But even under KSR, the problem here is not that the district court weighed the two different experts' views or affidavits and made a weighing and a balancing on summary judgment that would have been improper. The district court looked at Dr. Anderson's affidavit, and I think his evidence is essentially the only evidence that you presented. He said, I'm not going to take your word for it. You can't point to. No, he said that Dr. Anderson's affidavit simply didn't contain enough to support the argument that this claim was obviousness with a clear and convincing burden. Well, my reading of the district court's decision is that Dr. Anderson didn't provide a teaching suggestion of motivation to start with FDPs. And that's why it stopped. But I think fairly, if you read the district court's opinion, even though certainly the words teaching suggestion motivation were used and motivation used frequently, the analysis, it seemed to me, was simply a question of whether there was a reason presented. It wasn't a narrow focus. Other than just retracing the inventor's steps, which is hindsight blueprint. Exactly. And it seems to me that, for example, the statement here in paragraph five of Dr. Anderson's affidavit says, Thus, a person of ordinary skill in the art would have been motivated to select it, the FBPase, over the hundreds of enzymes the body uses to metabolize sugar due to its unique role in glucogenesis. Well, that's his statement. But why? What's the basis for that statement? Is there no citation to anything else in the art? Nobody ever wrote an article about it or said anything about it? Well, no. He points out, actually, that inhibitors of FBPase had been created in the laboratory. But he was pointing out as a result. But you're talking about Dr. Benefick's work, but that's not associated with diabetes. No. And aside from that, if you read this affidavit, it just reads like hindsight. It's simply a characterization of what Dr. Anderson understood after having recognized what Dr. Marinoff had done. Well, I think that would have been fair grist for cross-examination. I don't think, on summary judgment, where all inferences are to go our way and the like. Fair enough. But there's case law saying pure conclusions don't cut it on summary judgment. They have to have a foundation. A pure conclusion doesn't require a trial. Even if it's by an expert. He didn't just say FBPase would be a good base to start. He gave reasons for that. It has a unique role in gluconeogenesis. And unlike other enzymes that are involved, it doesn't play a role in glycosis. That was his after-the-fact reasoning. But what evidence is there to show that that was something that those of skill in the art would have recognized or would have known? He phrased it in terms of what was known at the time. That was known at the time. Why were people designing inhibitors of FBPase? But then he points to the work of the inventor, Dr. Marinoff, to show what was known. Because he did it. Again, I think that goes to the serendipity of the invention. I think that it does kind of flip the analysis. He looked at it not from the point of view of someone looking for an epilepsy drug, but from the point of view of the inventor. I agree it was the same problem faced by the inventor. But I think that in this type of a situation, that's what should be looked at. Do you argue that separate from what you say is the adequacy of the Anderson Declaration, that the summary judgment decision as to obviousness is fatally flawed because it was based on a violation of KSR? I think that it put more weight on an explicit teaching motivation suggestion than would have been committed had KSR been decided. Where do you get the explicit part of this? It looked to me like Judge Chesler was very careful to make it clear he wasn't limiting it to something said explicitly in a particular prior art patent or other prior art reference. He makes an allusion to what people in this art knew. He doesn't say anything about explicit that I recall. Well, he says Smilin offered no evidence that there was a suggestion from any source to use FBEA. Where's explicit? You're putting explicit in there and it's not in there. Any source could just be the general knowledge in the art. It could be the nature of the problem. It could be the broader sense of a flexible TSM test, couldn't it? In fact, it seems to me pretty much what he's doing here. Well, not when he says that Federal Circuit law requires rigorous application. I know he said that, but he seems to be applying a much broader view even though he recites what he thinks the Federal Circuit meant. But at the same time, he completely discounts what Dr. Anderson has to say about what one ordinary skill in the art would be. You've made that point. Thank you. All right, we'll restore three minutes rebuttal for you. Mr. Roper. Thank you very much, Your Honor. Let me just, while we're on that topic, address the last subject that was discussed because I think there's a few points I'd like to make. First of all, Judge Chesler was quite clear on this in his opinion. There is nothing in this Anderson Declaration that relates diabetes to FBPA's inhibition. He gets that entirely from Mayer. He says it in paragraph four of his declaration on page 5156, and he reaches that conclusion. How do we know he didn't do a rigorous TSM test? That would, of course, violate KSR and might cause us some difficulty.  I think the best answer to that is this. First of all, obviously, you have to look what he actually did. KSR hadn't come out. They hadn't used that language yet, so you have to look what he actually did. And the portion of KSR that Mr. Harth cites is the portion that says, you know, if you have a finite number of possibilities with predictable consequences or predictable results, maybe that's obvious. Well, we don't have any predictability here. We have zero. I mean, as you were pointing out, Judge Ritter, in other words, why in the world would someone skilled in the arts start a diabetes research program if he's going to be looking for an anti-convulsant or an anti-epileptic drug? It just doesn't make any sense whatsoever. So from the get-go, from the very beginning, all he's doing is following the path of the inventor. And that's just improper. So that's the fundamental error. I think that's the fundamental error of following this court's decision on life technologies. With their analysis, with Anderson's analysis, it just follows what the inventor did. I should make this point, too. This declaration of Anderson, that's the third thing he filed on this subject. He filed his expert report. Then we moved for a preliminary injunction. He came in and added a little bit more on this obviousness thing. And this is as far as he would go. This is the third one, the third one. And he still, even here, doesn't say FBPA's inhibition is something one would use to treat diabetes. I mean, it just doesn't say it. So the basic allegations that they make on their supposed theory of obviousness is just wrong. I mean, not only is it legally flawed, but it's just wrong, as Judge Chesler points out. Does it make a difference that there's nothing about FBPA's as a diabetes treatment when a number of the claims simply claim the drug and not any use for diabetes? Yes, I think so. We're not talking about today, but we're talking back then. The only usefulness of dopyrumate is an anticonvulsant drug. So in order to have any motivation to go for the drug, you'd have to have some utility for it. It's got zero utility except as the anticonvulsant. Could we move to the claim construction? Yes. The claim one uses and seven, eight times only once, you say, in the conjunctive sense. How do we reconcile that? Yeah, I think that the way to reconcile it is the fact that, well, you look, and can be used a lot of different ways, obviously. It's a functional word. People use it all the time in a lot of different ways, and you have to look at the context. In the case, in the area where it's listing these two alternatives, it's used in conjunction with independently and together. And those two then signal the fact that it is being used as an expression of these alternatives. So in that instance, it's got independently and together. And I might add that Mr. Hart said a moment ago that the claim says that R1 and R2 are hydrogen and lower alkyl, but it doesn't. It says they are independently hydrogen and lower alkyl and together may be the other formula two structure. So I think the language of the claim uses an entirely appropriate use of the word and. But I think also the case certainly really, I think, reflects the wisdom of the Phillips approach, because here you've got this claim language and you've got all the intrinsic evidence. You've got the claims, the dependent claims. You've got the specification. You've got the prosecution history, and the prosecution history is clear. What are you going to point us to in the specification that helps us here? The specification is the language that is similar to the language that Mr. Hart referred to on the first, the way the claims were drafted. In other words, the specification uses that kind of language twice. Where? Here. If you look at, well, let's do it. Column one? Yeah. We're at the bottom of column one? Yeah. Eighth of five or five. Column one. Some things of the invention are of the following formula, where X is CH2 or oxygen, R1 is hydrogen or alkyl, and here we are. R1, R2, R3, and R4 are independently hydrogen or lower alkyl, and when X is CH2, R4 and R5 may be alkane groups joined to form a benzene ring, and when X is oxygen, here we go again, R2 and R3 and or R4 and R5 together may be methylene dioxide, a group of the following formula, too. Why was some of that language, which appeared in the original claim, deleted? The examiner just wanted, thought they would narrow the claim to have X be oxygen. The examiner wanted a less clear claim? No, he limited the scope of it to make sure that X was oxygen. And by the way, Mr. Harth admitted, freely admits, that here we see it, that this language is correct. It expresses the alternatives. He admitted it below, and I think he just admitted it a little while ago. So the specification supports it, and the prosecution history is filled with it because they elected to pyramid in the first place. Mr. Harth's brief discusses the Chef America case as supporting his proposition. Can you distinguish that? Sure. I mean, frankly, in Chef America, the word to meant to. Here, the word and means and. We're not saying and is given some meaning that it doesn't have. And means and. It's one of the definitions of and. And in context, it's very clear what it means. In Chef America, to meant to. It was used in the specification that way. In other words, in Chef America, it could only be interpreted to reach the nonsensical result. And the same is not true here. You've got actual alternative meanings, and you've got to consult the context to select the right one. That's a very good way to say it, Judge. Is he making an argument? So I think that. Another litigation-induced position. Two out of three. I'll get mine in there soon. So once again, I think it just this court, I think, in Phillips recognized that if you get into little nice discussions about what words mean, you may be missing the forest for the trees. You've got you should look at the full intrinsic record to try to figure out how these claims should be interpreted. And specifically, I mean, the court said you use the prosecution history to show how the PTO and the inventor understood the patent. Mr. Robert, if we gave the intermediate word and the conjunctive meaning that Mr. Harth says it should get, in your view, what Salfa makes would then be covered by claim one? If you interpret it the way he interprets it. That the claim to be met would have to have everything before the and, and in addition, everything after the and. What would it then cover? I'm not sure. Let me put it this way. If you didn't have. And I think this is the way to answer the question. I'm looking for help. Yeah. I think if you, if you put a period after R, hydrogen or lower alkyl, and you struck the rest of the claim sentence, and you took out independently. Then I suppose the claim would be limited to Salfa mates where those R groups are independent and they are either hydrogen or lower alkyl. But that's not the claim we have. And obviously the other language has to mean something. And so I think that giving the language meaning, which we're supposed to do, compels their conclusion. What about our effective date here? The district judge sadly doesn't get his injunction until after the 30 months stay had expired. And it goes into effect. Does he have authority to kind of backdate the whole process? I think he not only has. I'm going to just mention one thing. You know, they asked for an extension of time to brief this thing. And so he entered this preliminary injunction in time to allow for additional briefing. Then after he heard the merits, he entered the final thing. But I think it's a little bit strange for them to be saying that he didn't enter the preliminary injunction in time. In fact, the temporary preliminary injunction was entered to give them more time to file a brief. Yeah, but they're not stopped from making the argument because they encouraged this time lapse that occurred. If there's no authority to make it retroactive, then the fact that they delayed the proceeding past 30 months wouldn't create the missing authority. Then I would say this, which is really the answer to your question, Judge Rader. I'm sorry it took so long. The sections of 355 that they rely on, 355J5B, are sections that when you read them I think are very clearly directed to the Pudin drug administration. Only. Only, not to the court. The section that is directed to the court is 271E4A. And that is very clear on what the district court is to do. If you find it valid and infringe, the court shall enter an order resetting the effective date. It's unlike the injunction statute, which says the court may enter the injunction subject to principles of equity. 271E4A says you shall enter it. So I think, coming back to your precise question, Judge Rader, yes, he does have authority under that statute. It's right there. It's very plain. It says you shall enter the order. And the other part of the statute that they point to is directed to the Pudin drug administration. All right. Anything further? I don't have anything further. Thank you kindly, Mr. Hart. Three minutes. Well, first I'd like to talk about the role of the specification. The specification, by our last count, uses word and about 190 times. And in every single instance, that word is used in its conjunctive sense. Are you proposing some rule of math that a word is used in one meaning X times that it may never be used with a different meaning even once elsewhere in the patent? No, but we do look to the specification to see if the inventor acted as his or her own lexicographer. And there is no indication in the specification that the patentee used the word and in anything other than its common conjunctive sense. Don't we have that in column one where we just saw the language with the when clauses that made it very explicit what was intended? There you have the signals. And so don't those signals tell us that perhaps we should be reading the claim in the sense suggested by Ortho? But the signals never made their way into the claim language, and that's the problem. But if one of skill in the art is reading this, and he's reading claim five and two and nine and ten, all of that context, why wouldn't that lead him to a disjunctive use of and? Because that would be an unnatural use of the English language. And what Phillips tells us in terms of common everyday words is we don't go and find some dictionary definition that supports it. Phillips discredits the Texas Digital approach of the full range of dictionary definitions. You said earlier that and rarely is disjunctive, but much of what you've said since suggests that your real view is that and can never be disjunctive. So which is it? And can never be disjunctive unless it has the appropriate signals. Change between. Where do you derive that rule? What case holds that? Look at the dictionary. The dictionary is not a case. What legal authority requires your result? The process control case that we said in our brief, I think, is instructive. And there, the judge, it was a district court case, but the judge found there's no reason to treat this use of the word and any differently than. Here there is a reason. It's not linguistic. It's chemical. It's commonsensical. It's the only way to make sense out of this claim. Well, if you want to, if you start out with the idea that it has to cover a pyramid. No, no, I'm not starting out with that idea. I'm starting out with the idea that we should read it to carry out the purpose that the rest of the specification makes clear. But that sounds too much like legislative intent to me. But didn't the drafter make it clear it's supposed to cover topyramid by giving us Claim 5? The Claim 5 certainly cannot inform us of what the claim is. Explicitly topyramid, though, and it is supposed to be what is within the independent claim, right? It's supposed to be, but it's not, and that's where the problem is. You said, you know, if we could find the signal of what they meant, why isn't that the signal? Because the signal was taken out before it made its way into the claim. You're saying there has to be a word signal in the sentence comprising the claim. If there's not. And so you're excluding the possibility that the signal comes from chemical knowledge or common sense or a dependent claim. If you say Jack and Jill. No, no, let's not do that. We're talking about chemistry. All right, say hydrogen and lower alkyl. If you say hydrogen and lower alkyl, that means both sides of both words on either side. The other argument is it all depends on the context. Lots of times it would mean both. Sometimes it would mean either. You have to look at the context to know. But there's nothing that tells you in the claim itself. Claim five doesn't tell you what the word hand means. There's no point in all of us just repeating what we've already said. All right, thank you. All right, we'll take the case under advisement.